LEWIS et al. v. STEWARD et al.

No. 32425.   April 10, 1951.

*230 P. 2d 455.*

350

John F. Butler, Oklahoma City, and A. E. White, Poteau, for plaintiffs in error.

Alpheus Varner, Poteau, and Gilliland, Odgen, Withington, Shirk & Vaught, Oklahoma City, for defendants in error.

LUTTRELL, V.C.J. This action was brought by J. S. Steward and Frank Beutelschies against the defendants, Vincent Lewis and Charles Lewis, individually, and Vincent Lewis and Charles Lewis, doing business as Lewis Coal Company, and other defendants, to cancel a coal mining lease and supplemental lease made by plaintiffs and held and operated by the defendants Vincent Lewis and Charles Lewis on 20 acres of land in Le Flore county. In the action plaintiffs also sought an accounting for royalties due on coal mined; sought to recover the value of certain coal alleged to have been converted by the defendants, and an injunction to prevent the further operation of the mine by said defendants. They also asked in their petition for a lien upon the property of Vincent and Charles Lewis in the amount which the court might find due to plaintiffs as royalties and for the conversion of coal. All the defendants except Vincent and Charles Lewis disclaimed. Vincent and Charles Lewis, individually and as partners, hereafter called defendants, answered admitting the execution of a coal mining lease and supplemental lease; admitted that defendants were in possession of the mine and its ownership by plaintiffs, and denied that they had failed to comply with the lease contract in any particular, or that they were indebted to the plaintiffs in any amount. By cross-petition they alleged that while they were in possession and operating the mine under the lease and supplemental lease aforesaid, the plaintiffs were carrying on operations in an adjoining mine, and that as a result of improper mining practices in the adjoining mine said mine caved or squeezed, and that such cave or squeeze extended over and up-

on the mine operated by defendants so that they were compelled to abandon all working of the mine and spend considerable sums of money in removing their property therefrom, whereby they had been damaged in the sum of $20,-000. They also sought recovery from plaintiffs for coal which they claimed plaintiffs improperly removed from the mine operated by defendants during the operation of the adjoining mine by plaintiffs. Both sides waived trial by a jury and the trial court rendered judgment in favor of the plaintiffs for royalty due on coal mined by the defendants in the sum of $3,105, and judgment for coal converted by defendants in the amount of $19,905. It rendered judgment for the defendants for coal improperly taken from defendants' mine by plaintiffs in the sum of $3,000, and for loss of profits due to the negligence of plaintiffs in the sum of $19,-253.10, leaving a net amount due plaintiffs in the sum of $757.25. It also cancelled the lease and supplemental lease held by defendants and quieted plaintiffs' title to the mine as against the defendants. Defendants appeal from the judgment against them, and plaintiffs cross-appeal from the judgment against them.

From the record it appears without contradiction that plaintiffs were the owners of the coal deposits under the northeast quarter of the southwest quarter of section 26, township 9 north, range 24 east, in Le Flore county, and that on December 22, 1927, their predecessors in title leased the entire property for coal mining purposes to Andrew Lewis and Vincent Lewis; that thereafter, by supplemental lease, dated May 5, 1928, the original lease was modified so that it covered the west half of the northeast quarter of the southwest quarter. This west half of the 40-acre tract was operated by Vincent and Charles Lewis, Charles having succeeded to the interest of Andrew Lewis, and was commonly referred to as mine No. 12. The east half of the tract was by plaintiffs leased to other parties who operated the same, and is commonly referred to in the record as mine No. 11. By the lease and supplemental lease under which the defendants held mine No. 12, they were required to pay certain minimum royalties whether coal was produced or not, and were also required to pay a royalty of 25 cents per ton on coal removed by them from the mine. It appeals that both mines were originally intended to be used for the recovery of coal close to the surface, but were driven to a considerable depth in order to recover coal which lay farther below the surface. At some time during the year 1940, the exact date not being shown by the record, a cave-in or squeeze occurred in mine No. 11 at a depth of about five or six hundred feet below the surface, which precluded the further operation of that mine below the point where the cave-in occurred. In the early part of 1942, at sometime between January 28th and February 18th, a cave-in or squeeze, at approximately the same depth as that in mine No. 11, occurred in mine No. 12, precluding the operation of said mine at a deeper level. After this squeeze or cave-in occurred in No. 12 defendants began the mining and recovery of coal contained in the pillars supporting the various levels above the cave-in, the removal of which pillars without the written consent of plaintiffs was strictly forbidden by the terms of the original lease. This work was begun by defendants in August, 1942, and after plaintiffs were advised that such work was being conducted they served notice of cancellation of the lease upon defendants and demanded that they cease removing the coal contained in the pillars. Defendants, however, continued to remove the coal pillars above the cave-in until some time in 1943, when this action was filed.

On appeal defendants first contend that the breaches of the lease for which cancellation was sought in the action, and the payment of minimum royalty and royalty for coal sold by wagon haul

or used in the mining operations of defendants, which plaintiffs sought to recover, were waived by plaintiffs, and that the judgment in this respect was erroneous. We are inclined to agree with this contention. Plaintiff Beutelschies, the member of the plaintiff partnership who was in charge of the operations, admitted that practically from the outset of the operations of the defendants upon the leased property they paid royalty only upon railroad cars of coal produced by them, and paid no royalty for coal used in operation of the lease, or sold in any other amount except carload lots, and that the plaintiffs made no effort, other than an occasional demand upon the defendants, to collect either the advanced royalty provided in the lease or royalty for coal used in the operation of the mine or sold by the wagonload. He stated that he had asked the defendants several times for back royalty but that they always seemed hard up and therefore he did not insist upon payment. He also testified that the father of the defendants was a good friend of his and he wanted to see the boys make good, and for this reason he did not insist upon the payment of these royalties. It appears that no record was kept by defendants of the coal sold by the wagonload, or of the amount used in the operation of the mine, and that payments of royalty on carload lots were consistently accepted by the plaintiffs as a compliance with the terms of the lease. It also appears that, in 1940, by agreement of the parties, the 25 cent royalty for coal produced was reduced to 15 cents per ton, and while plaintiffs testified that this was to cover only coal mined by the defendants by extending the mine into other land owned by plaintiffs, the record shows that this 15 cent royalty was consistently accepted by plaintiffs upon all coal produced by defendants up until the time defendants began removing the coal pillars from the mine, and that upon this pillar coal plaintiffs refused to accept the royalty and did not cash the checks delivered to them in payment therefor by defendants. We think the evidence sufficiently shows a waiver by the plaintiffs of strict compliance with the provisions of the lease as to royalties, and that they accepted payments made on carload lots as a sufficient compliance with the terms of the lease.

In Ketcham v. Oil Field Supply Co., 99 Okla. 201, 226 P. 93, we said:

"A 'waiver' is the voluntary or intentional relinquishment of a known right, which involves the notion of an intention entertained by the holder of some right to abandon or relinquish instead of insisting on the right; . . ."

In Skelly Oil Co. v. Funk, 197 Okla. 659, 174 P. 2d 241, we said that a party may waive a right by conduct or acts indicating an intention to relinquish such right, or by failure to insist upon such right. In the instant case the acceptance by plaintiffs over a long period of time of royalty payments on carload lots of coal only, and their failure to insist upon an accounting for coal used in the operation of the mine or sold in wagonloads, or to insist upon the payment of the minimum royalty specified in the lease, in our judgment, constituted a waiver of the payment of royalty on coal so sold and used, so that they may not now insist upon a strict compliance with the terms of the lease in this respect. The judgment of the trial court, so far as it awarded the plaintiffs a recovery for royalty other than the royalty on carload lots of coal, which concededly were paid to and accepted by them, is not supported by the evidence, and is clearly against the weight thereof.

Defendants also complain of the judgment rendered against them by the trial court for the conversion of the coal contained in the pillars supporting the levels above the squeeze or cave-in in mine No. 12. The provision in the lease with reference to the taking of coal from said pillars reads as follows:

"The Lessee shall not pull or draw any pillars without the written consent of the Lessors first being obtained

and at the abandonment of this mine at any time, the *entires,* air courses, slopes and all other mine workings shall be left in a good workable condition and the mine shall be kept pumped out."

Defendants attempt to justify their action in pulling or removing these pillars of coal upon the ground that the cave-in below them had rendered further operation of the mine at greater depths useless, and that it was good mining practice for them to take out the pillars and the coal close to the surface, which they were also prohibited from taking by the terms of the lease, in order to recover this coal from the mine. The defendant Vincent Lewis admitted upon the witness stand that he knew the lease provided that defendants could not pull the pillars without consent in writing from the plaintiffs, and that he removed it without discussing the matter with plaintiffs or asking for permission. He testified that there was little expense in removing the pillar coal; that that was all the coal left that he could get, and that his removal of such coal was consonant with good mining practices in order to recover as much coal as possible from the mine. He urges that the only purpose of leaving the pillars would be to leave the mine in a workable condition, and that when the workable condition was destroyed by the caving at the lower depth, the pillars would serve no further purpose and that therefore he was justified in removing them. We are not impressed with this contention.

The prohibition in the lease is positive, and in effect amounted to a reservation of the coal in the pillars to the lessor. Whether or not any good purpose would be served by leaving them in the mine in its then condition was a question to be determined by the lessors, and not by the lessee. In the face of this positive requirement in the lease that defendants should not remove the pillar coal without first obtaining the written consent of the plaintiffs, its removal by them without obtaining such consent, and in violation of the express terms of the lease, amounted to a conversion of the coal so removed. Vincent Lewis testified that the amount of pillar coal removed by him was some 3,981 tons of the value of $5 per ton, and that its net value per ton to him after the cost of removal was some $2 per ton, whereas the value of the deeper coal after removal was $1 per ton. He gave no reason or excuse for failing to obtain permission before removing this coal. The judgment of the trial court awarding the plaintiffs the value testified to by Lewis for the coal so wrongfully removed from the mine by him is amply sustained by the evidence, since its wrongful removal and its value were admitted by the defendants.

Defendants also complain of the judgment of the trial court canceling the lease, but we think their admission that they wrongfully removed the coal pillars was a sufficient violation of the terms of the lease to sustain the action of the trial court in this respect, regardless of whether or not previous breaches of the lease had been waived or acquiesced in by the lessors.

In their cross-appeal plaintiffs first contend that the trial court erred in rendering judgment against them for 3,000 tons of coal which it was charged was wrongfully removed from mine No. 12 by the lessees of mine No. 11. We think this complaint well taken.

From the record it appears that some coal was removed from the mine of defendants by the lessee of mine No. 11 after the cave-in had occurred in mine No. 11, and from the testimony of plaintiff Beutelschies, which is not contradicted in the record, this was done pursuant to a meeting of defendants and the lessees of mine No. 11 at which Beutelschies was present. It appears that Beutelschies had given his permission to the lessees of mine No. 11 to take coal from the upper

levels of mine No. 11, but that he had given them no permission whatever to take coal from mine No. 12. He testified that there was some coal taken by the operators of mine No. 11 from mine No. 12, and some taken from mine No. 11 by the defendants as operators of mine No. 12. Defendant Lewis estimated the amount taken from mine No. 12 by the operators of No. 11 at approximately 1,600 tons, and the amount was estimated by an engineer to be in the neighborhood of 1,458 tons. However, there is no evidence in the record that this coal was so taken from the defendants' mine with the permission or consent of plaintiffs, or that they received any profit therefrom other than the royalty of 25 cents per ton which was paid to them by the operators of mine No. 11. We are unable to find in the evidence any facts or circumstances testified to by any witness which would cast a liability upon the plaintiffs for this taking of defendants' coal by plaintiffs' lessee without the consent or approval of plaintiffs. The judgment of the trial court holding plaintiffs liable for the taking of such coal was therefore erroneous.

Plaintiffs also complain of the judgment of the trial court holding them liable for the squeeze or cave-in of mine No. 12 and assessing them for the anticipated profits of defendants had the cave-in not occurred. We consider this contention well taken, for the reason that from the record there is no evidence establishing that the squeeze of mine No. 12 was due to the improper operation of mine No. 11.

The evidence does not disclose what caused the squeeze or cave-in in mine No. 11. There is no contention that any supporting pillars below the depth at which the squeeze in mine No. 11 occurred had been removed prior to the time of the cave-in, and the principal witness for the defendants, the district mine inspector for that district, testified that it would not be possible to have pulled pillars below the 500-foot mark after the squeeze. This witness testified that from his previous experience as a coal miner he was of the opinion that the squeeze in No. 11 "rode over" into No. 12 and caused the squeeze in No. 12. He admitted, however, that the squeeze in No. 12 could have come either from the west side of No. 12 or from No. 11, which was east of No. 12, but stated that he really thought the squeeze in No. 12 came from the removal of coal in No. 11 close to the surface. He admitted that he had no way of knowing it, but that that was his opinion, and that he believed that any mining man would agree with him if he saw what the witness had seen in No. 11 and in No. 12 later on. He further testified that he went down into the Lewis mine, and regarding his visit to that mine testified as follows:

"When I went down I wouldn't ask any man to go down, it squeezing like it was. We went down about 450 feet where you first get the squeeze and both sides were bursted. You couldn't tell which way it came from because it had done rode over. If it come from this way it had done rode over and if it come from this way it had done rode over.

"Q. (Mr. Butler) When he said 'It comes from this way' he indicates from the West to the east.

"Mr. White: Q. Use east or west. A. All right, if the squeeze came from the West it rode over to the east, but when I got there that was over this pillar and bursted on either side of the slope that I could run my arm back in the coal lots of places."
and further:

"Q. If I understand it, when you went down into No. 12 after the squeeze had occurred that the squeeze had quit settling, or to say the least, the thing had completely squeezed in and there was nothing there in No. 12 that you could see by way of evidence to show you whether it actually started from the east side or west side? A. It hadn't settled but it had almost closed both sides of these pillars and no man could come up and say it come from this side or that side. It might have been that I could have determined that but my salary is not large enough for me

to crawl back in these places to see which way it come from. All I was interested in was the safety of these men down here and that's the reason I didn't go any further down the slope."

The uncontradicted testimony both of the plaintiff Beutelschies and the plaintiff Steward was that the removal of the pillars in the upper portion of mine No. 11 above the cave-in in that mine was not commenced until some time in 1942, after the squeeze had developed in No. 12. Nor is there any evidence in the record to the effect that the removal of these pillars produced any further or additional cave-in in mine No. 11, although some of the questions asked by counsel for defendants intimated that such further cave-in had occurred. Thus it is evident that the testimony of the deputy mine inspector, who was not an engineer or expert in the sense that he had any technical knowledge on the subject, merely stated his opinion as a practical miner, based perhaps on his previous experience, but qualified that opinion by admitting that such might not have been the cause, and that because of the risk involved he did not make a sufficient examination of mine No. 12 to determine just how the cave-in occurred or what caused it. The theory that it might have been caused by the removal of the pillars in mine No. 11 above the cave-in is met with the positive testimony of the plaintiffs that such pillars were not removed until after the cave-in in No. 12 had occurred, and by the total lack of any testimony that the removal of the upper pillars occasioned a further caving of the upper portion of mine No. 11. It is not disclosed from the record whether all the upper pillars in mine No. 11 were removed or not, but the district mine inspector testified that if all of them had been removed mine No. 12 would not have been affected by the removal, in case the pillars left in mine No. 12 were sufficient to sustain the weight placed upon them by the overlying strata. He further testified that the pillars in both

No. 11 and No. 12 were not of sufficient size when the depth of the mine was taken into consideration, stating that when the mines were begun they were designed for mining at a shallow depth, and that the pillars were not large enough for the operation of the mines at the depth to which they had been carried.

We have carefully examined the testimony of this witness, who was the only witness produced by defendants to establish their contention, and are of opinion that his testimony was of such a speculative character that whether the case be regarded as a law case or an equity case, his testimony is not sufficient to sustain a judgment against the plaintiffs. As pointed out above, the testimony of the deputy mine inspector was not based upon facts, or any conditions in either mine upon which he could reasonably reach a logical conclusion that the cave-in in No. 12 was due to conditions in No. 11, but was based solely upon his past experience as a miner, and his idea that because he had observed the "riding over" of squeezes or cave-ins in other mines the same situation existed here. This, in our opinion, was not sufficient to justify the rendition of the judgment against plaintiffs.

The judgment in favor of plaintiffs and against the defendants for the sum of $19,905 for coal converted by defendants, and for the cancellation of the lease and supplemental lease held by defendants, is affirmed.

The judgment against defendants for minimum royalties and for royalties on coal used in the mining operations of defendants, or sold by them in wagonloads, is reversed, with directions to render judgment for defendants.

The judgment against the plaintiffs in the sum of $19,253.10 for anticipated profits from mine No. 12 for the years 1942, 1943, and 1944, is reversed, with directions to render judgment for plaintiffs.

356

WELCH, HALLEY, JOHNSON, and O'NEAL, JJ., concur. CORN and GIBSON, JJ., dissent.